[No. 39910.   En Banc.   July 17, 1969.]

TOM E. DAY et al., *Respondents*, v. INLAND EMPIRE OPTICAL, INC., et al., *Appellants.**

*Reported in 456 P.2d 1011.

*MacGillivray, Jones, Clarke & Schiffner,* by *John D. MacGillivray,* for appellants.

*Malott & Southwell* and *Thomas Malott,* for respondents.

*Williams, Lanza, Kastner & Gibbs, Henry E. Kastner, Quackenbush, Dean & Smith, Roger K. Gigler, The Attorney General* and *Jane Dowdle Smith, Assistant,* amici curiae.

HALE, J.—A deceptive calm, we surmise, pervaded the Spokane medical fraternity when plaintiff doctors and a corporate optician initiated this suit to enjoin their fellow practitioners in the medical arts from practicing ophthalmology and at the same time conducting a corporate optical dispensing business. The quiet air of scholarship now so evident in these proceedings, notwithstanding a foray into medical ethics at the outset followed by side trips into the area of medical economics, obscures, we think, a genuine

hullabaloo among Spokane doctors that spread throughout the state. It is to be expected that a complaint charging medical rebates, refunds, commissions and profits would produce a controversy among practitioners of the healing arts, but we must take care that the controversy does not overshadow the legal issues.

Plaintiffs started out with a simple attempt to enjoin certain of their fellow ophthalmologists in Spokane from practicing medicine and simultaneously operating a prescription optical business. Their suit drew the intervention of 20 doctors specializing in such fields as internal medicine, surgery, orthopedics, urology and radiology. Then, the Eye and Ear Physicians' Council of Washington State entered the dispute as amicus curiae, and, to bring things full circle, the Washington State Medical Disciplinary Board projected the Attorney General into the action as another friend of the court.

The parties, direct and collateral, ask us for a broad declaration of principles, one we think which would produce a sort of general juridical catalog of basic rules for the ethical practice of medicine and its allied arts in this state and convert what has been adopted as a code of ethics into a code of law. We deem it, however, the better part of wisdom to stick to the issues and confine our opinion to those points, narrow as they may be, raised by the pleadings between the real parties in interest. Accordingly, we decline this tacit invitation to compile a compendium of sins and virtues for those engaged in the healing arts and proceed to the precise issues of the case.

Dr. Marc Anthony, specializing in ophthalmology and Dr. Louis A. Parsell, a medical specialist, limiting his practice to the eye, ear, nose and throat, along with plaintiff Tom E. Day, a licensed dispensing optician, instituted this suit. Mr. Day was the president and general manager and with his wife owned all of the capital stock of a retail optical dispensing business called Tom E. Day, Inc. The two doctors and Mr. Day were licensed by the state of Washington and had practiced their professions for many years in Spokane.

Joining as plaintiffs, they brought this action against sev-

eral medical doctors, a corporate optical company and a licensed practicing optician. The doctors, Robert J. Davis, Charles L. Gates, Robert C. Maher, William C. Richter and O. W. Jones, III, were all licensed physicians and surgeons, each specializing in ophthalmology. Defendant doctors practiced together in a medical partnership called the Spokane Eye Clinic, with clinic offices in the upper floor of a building at South 427 Bernard Street, Spokane. They leased their private offices, waiting rooms, treatment rooms and equipment for the practice of ophthalmology from the defendant corporation, Inland Empire Optical Company, paying a rental determined by a member of the American Institute of Real Estate Appraisers. Inland Empire Optical occupied the lower floor of the building and conducted an optical dispensing business there. All of its capital stock was owned by the defendant doctors whose offices were, as stated, situated on the floor above the optical company's offices and shops.

Defendant Inland Empire Optical[1] in its ground floor premises employed four licensed dispensing opticians, two technicians and two office girls under the management of defendant Lloyd V. Anderson, a licensed optician. His income from the company came to him solely in the form of a manager's monthly salary and a year-end Christmas bonus. Inland Empire Optical had merged with Spokane Optical Company, a smaller but similar company organized in 1956, which earlier had conducted a dispensing optical business in the same location. The merger has little consequence here except that, before its occurrence, the ophthalmologists in the partnership on the second floor of the building were the sole owners of the capital stock of both corporations. After merger, defendant doctors remained sole owners of all capital stock in the surviving entity, Inland Empire Optical Company.

Inland Empire Optical, as earlier noted, owned the real estate, building, furniture, fixtures and equipment occupied

---

[1]Defendant Spokane Optical Company merged with defendant Inland Empire Optical, Inc., and the two entities will be regarded as one for purposes of this opinion.

by and used by the defendant doctors in the Spokane Eye Clinic on the second floor; it owned the machinery and equipment for grinding and dispensing eyeglasses used in the conduct of its business as a dispensing optician on the first floor.

That a close affinity existed between the practice of ophthalmology by defendant doctors, as members of the Spokane Eye Clinic on the second floor of South 427 Bernard Street, and the retail dispensing optical business, conducted by Inland Empire Optical on the first floor, may be seen in the following figures:

| Year | Pairs of Eyeglasses prescribed by defendant doctors | Pairs of Eyeglasses dispensed by Inland Empire Optical, Inc., and its subsidiary, Spokane Optical Company | |
|---|---|---|---|
| 1962 ............... | 8,693 | 8,344 | |
| 1963 ............... | 9,921 | 9,413 | |
| 1964 ............... | 10,652 | 10,333 | |
| 1965 ............... | 10,696 | 10,495 | to July, 1965 |
| 1966 ............... | 10,305 | 14,986 | July, 1965, through September, 1966. |
| Totals ............ | 50,367 | 53,571 | |

It is apparent that the defendant doctors maintained a legal, managerial, financial and perhaps sentimental connection with Inland Empire Optical. Their ownership of all the capital stock gave them the legal, managerial and financial control over it with power to hire, promote and fire its personnel, incur and pay its debts, and keep its profits. As to profits and earnings, the record shows that none were ever distributed to the defendant doctors and that a major part of Inland's earnings had been invested in capital improvements, furniture, fixtures and equipment. Defendant ophthalmologists had never requested nor directed that they receive any payment, credit or consideration from their capital stock but its value had increased markedly. Eventually, however, in one form or another, whatever profits or gain Inland Empire Optical may derive from the sale or dispensing of eyeglasses and other optical consumer products will inure to the defendant doctors as its sole shareholders.

The spatial relationship between the defendant doctors' offices and laboratories on the second floor of South 427 Bernard Street and the Inland Empire Optical Company's business operations on the first floor showed a close connection between them. Inland Empire Optical, owner of the entire building, had its main entranceway facing a parking area adjacent to it. This entry doorway contained no markings to indicate the nature of the business within, for the lettering on the door merely stated the business hours. The only other entrance to Inland's premises for use by its customers was a stairway leading down from the reception hallway of defendant doctors' eye clinic on the floor above.

Upstairs in the Spokane Eye Clinic, three black and white plastic signs, 5 x 8 inches, conveyed the following message to the doctors' patients:

FOR GLASSES
We have an optical shop downstairs
for your convenience
However, please feel free to take your
prescription to the optician of your choice.

One sign was located in the waiting room of Drs. Gates, Maher and Jones; another in Dr. Richter's waiting room and the third at eye level in Dr. Davis's office where the doctor usually handed his patients their prescriptions. The trial court found that, when a patient asked one of the defendant doctors where the prescription for eyeglasses should be filled, it was the doctors' practice to inform the patient that there was an optical shop for his convenience downstairs, but that the patient was free to take his prescription to the optician of his choice. Not surprisingly, the record shows that 85 to 90 per cent of the doctors' patients had their eyeglass prescriptions filled by Inland Empire Optical. It was agreed that optical prescriptions filled by Inland Empire Optical but written by doctors other than defendants were insignificant in number.

Concerning the relative cost of eyeglasses, the court found that:

Prices charged to patients for glasses dispensed by In-

land Empire Optical, by Erickson Optical Laboratory, by Thavis Opticians, Inc., and by Tom E. Day, Inc., the four major optical dispensing establishments operating in Spokane, Washington, are comparable and competitive.

Inland Empire Optical would bill the patient directly and receive payment for all eyeglasses dispensed. Contact lenses were not involved; the doctors in the Spokane Eye Clinic dispensed contact lenses directly to their patients and the clinic billed the patient directly and received the payment therefor.

For the record, it appears that the association between and cooperation among defendant doctors and their relationship with a dispensing optician, individual or corporate, were not unique in the profession. Between 30 and 50 per cent of licensed ophthalmologists practicing in this state, according to the trial court's findings, directly dispense glasses and contact lenses to their patients either as sole practitioners, as copartners, or in some form of joint venture in an eye clinic or through ownership of all or a majority of the capital stock in, or other means of legal control over, a retail optical dispensing firm.

Contending that all issues here have been resolved within their profession by a tribunal established for that purpose, defendant doctors point out that a complaint similar to the one before us had been brought by these plaintiffs before the Washington State Medical Disciplinary Board. Defendants showed that the board made findings, conclusions and decision and entered an order dismissing the complaint and completely exonerating defendant doctors of any charge of unprofessional conduct.

■ The adjudication by a tribunal established to interpret, apply and enforce a code of ethics, although entitled to great consideration, is not, in our view, a controlling decision on the same issues before the courts, however persuasively the ethical question may have been resolved. The complaint here, in our opinion, raises not only ethical problems but substantial issues under the statutes regulating the practice of medicine in this state, cognizable properly in the courts as well as by a disciplinary board of

the profession. Nowhere does it appear in the statutes, and we know of no principle of law which places in the Washington State Medical Disciplinary Board the sole power—to the exclusion of the judiciary—to interpret, apply and enforce the laws relating to the practice of medicine and optometry. We are of the opinion, therefore, that the jurisdiction of the state disciplinary board is not exclusive, and its consideration of and decision in the premises did not oust the courts of jurisdiction to interpret, apply and enforce lawful legislation regulating the practice of medicine in this state.

Aside from alleged violations of medical ethics, of which accusations the defendant doctors were cleared by the medical disciplinary board, the issues before us stem from RCW 19.68, first enacted as Laws of 1949, ch. 204, p. 654, and bearing the descriptive title "AN ACT relating to *rebates, refunds and unearned discounts* and prescribing penalties." (Italics ours.) That the legislature saw a menace to the public health and welfare in the possibility of rebates, refunds, commissions, unearned discounts and profits extracted or received by practicing physicians in connection with the referral of patients to others engaged in the medical arts is apparent from a reading of RCW 19.68.010, prohibiting such practices:

> It shall be unlawful for any person . . . to pay, or offer to pay or allow, directly or indirectly, to any person licensed by the state of Washington to engage in the practice of medicine and surgery, drugless treatment in any form, or dentistry, and it shall be unlawful for such person to request, receive or allow, directly or indirectly, *a rebate, refund, commission, unearned discount or profit* by means of a credit or other valuable consideration *in connection with the referral of patients* . . . or in connection with the furnishings of medical, surgical or dental care, diagnosis, treatment or service, on the sale, rental, furnishing or supplying of clinical laboratory supplies or services of any kind, or any other goods; services or supplies *prescribed for medical diagnosis, care or treatment.*

Any person violating the provisions of this section is guilty of a misdemeanor.

(Italics ours.)

Section 2 of the act, RCW 19.68.020, also denounces the earlier described practices as unprofessional conduct:

The acceptance directly or indirectly by any person so licensed of any *rebate, refund, commission, unearned discount, or profit* by means of a credit or other valuable consideration whether in the form of money or otherwise, *as compensation for referring patients* to any person, firm, corporation or association as set forth in RCW 19.68.030, constitutes unprofessional conduct.

(Italics ours.)

As an aider in interpreting RCW 19.68, the legislature sought to clarify its intentions as follows:

It is the intent of this article . . . , and this article . . . shall be so construed, that persons so licensed shall only be authorized by law to charge or receive compensation for professional services rendered if such services are actually rendered by the licensee and not otherwise: *Provided, however,* That it is not intended to prohibit two or more licensees who practice their profession as copartners to charge or collect compensation for any professional services by any member of the firm, or to prohibit a licensee who employs another licensee to charge or collect compensation for professional services rendered by the employee licensee.

RCW 19.68.040.

Deeming the defendant doctors and Inland Empire Optical to be in violation of the foregoing statutes, the court, upon findings of fact and conclusions of law, entered a decree (1) directing Inland Empire Optical Company under court supervision to divest itself entirely of ownership of all material and equipment used in connection with the manufacturing and dispensing of eyeglasses; (2) restraining Inland Empire Optical Company from filling any prescription for eyeglasses written by the defendant doctors as long as the doctors own stock or have any financial interest in that corporation; and (3) prohibiting the defendant doctors individually named in the decree "from

referring patients for whom they have prescribed eyeglasses to any dispensing optical concern in which they have any financial interest or investment." We think that the learned trial court's disposition of the controversy fundamentally sound but overly broad in resolving some of the points in issue.

Before returning to the merits of the case, however, we should first consider defendants' contention that the plaintiffs are without standing to maintain the action. Defendants argue that the plaintiffs, as licensed ophthalmologists and opticians prescribing and dispensing eyeglasses in Spokane, failed to show that the defendant doctors' ownership and operation of Inland Empire Optical Company has caused plaintiffs any pecuniary injury and that they, therefore, are without remedy in law or equity. Plaintiffs counter this argument with the assertion that operation of defendant Inland in the manner complained of makes captives of its customers and diverts the patients away from the ordinary channels of free trade. Plaintiffs contend that some of them would otherwise take their prescriptions to Tom E. Day, Inc., and that guiding the patients into the Inland Empire Optical waiting room deprives plaintiff Tom E. Day, Inc., of an effective and lawful opportunity to fairly compete for their business.

Although the stated position of the plaintiffs concerning the claims of unfair and destructive competition if amplified would probably suffice to afford them standing on that basis alone, their right to bring this action, we think, rests on more precise grounds. As licensed members of a profession, calling or trade which is subject to reasonable regulation by the state and without which license no one of them could lawfully practice or carry on the profession, trade or calling, each plaintiff could properly resort to the courts to require others so licensed to abide by the laws and regulations governing the practice or carrying on of the licensed profession, calling or trade. They may also utilize the courts to prevent unlicensed persons from engaging in the licensed profession, trade or calling. This is the effect of the holding in *Paul v. Stanley*, 168 Wash. 371,

12 P.2d 401 (1932), in which we granted injunctive relief to two lawyers against a licensed real-estate broker and enjoined the latter from practicing law. Inferentially, this principle is reasserted in *State v. Boren,* 42 Wn.2d 155, 253 P.2d 939 (1953). Similarly, in *Washington State Bar Ass'n v. Washington Ass'n of Realtors,* 41 Wn.2d 697, 251 P.2d 619 (1952), the court granted plaintiff injunctive relief prohibiting the defendant real-estate organization from performing acts amounting to the practice of law.

We think that the plaintiffs had standing, that they could seek the same injunctive relief against members of their own profession as they could against unlicensed persons attempting to practice medicine without a license. *See* Annot., 90 A.L.R.2d 7 (1963). More precisely, we are of the opinion that one lawfully engaged in the practice of a licensed profession has a legal and equitable right to insist that others practicing abide by the ethical standards and comply with the laws governing the practice; that violations, either of the ethics or laws governing the practice of the profession amount to an invasion of that right; and that a breach of ethics or violations of the laws by either licensed or unlicensed persons practicing the profession constitutes actual and substantial injury to others in the profession for which injury the courts will provide redress. *See Port of Seattle v. International Longshoremen's & Warehousemen's Union,* 52 Wn.2d 317, 324 P.2d 1099 (1958).

Returning now to the substantive issues, one should first note defendant doctors' ownership of all of the capital stock of Inland Empire Optical Company and their consequential control over it. This stock ownership carried with it the ultimate management and control of the corporation and the right to all profits derived from its operation. Whether the profits be distributed in the form of dividends, bonuses, salaries, *etc.,* to the owners of the stock or be allowed to accumulate within the corporation, increasing the corporation's net worth and the value of its stock, is

immaterial if in fact such increases could reasonably be deemed a refund, rebate, commission or profit.

■ Next, one should note the spatial propinquity between the offices of the practicing ophthalmologists and their subsidiary dispensing optical company—the locations of the entryways, stairway and doorways to all offices, creating traffic patterns for the doctors' patients who, with prescriptions in hand, were led almost directly to the waiting room of the dispensing optical company. Yet, this very spatial relationship between the offices of the Spokane Eye Clinic and Inland Empire Optical separated the latter physically from the immediate, direct and personal supervision of the doctors upstairs, a supervision contemplated by RCW 18.34.010. (*See* note 2, *infra.*)

Third, the signs displayed in the defendant doctors' offices telling the patients that "For glasses, we have an optical shop downstairs for your convenience. However, please feel free to take your prescription to the optician of your choice," amount virtually to a direct referral of the patients to Inland Empire Optical below. Finally, the ownership by Inland Empire Optical of the realty and offices in which the doctors practice, and of their furniture and equipment, and a corresponding lease back to the defendant doctors, supports the idea that the optical company was practicing as a dispensing optician under the corporate legal and financial control of and for the profit of the defendant doctors, without the immediate and direct supervision in the dispensing of eyeglasses and in filling prescriptions prescribed by RCW 18.34.010.

The accumulation of profits, increase in value of the common stock, growth in net worth, possible tax advantages, and right to a distribution of income from Inland Empire Optical accruing to the defendant doctors thus amounted to the receiving by them directly or indirectly of a rebate, refund, commission, unearned discount or profit or other valuable consideration in connection with the referral of their patients to Inland Empire Optical and the payment or allowance of same, directly or indirectly, by Inland Empire

Optical to them—all as specifically prohibited by RCW 19.68.010 and 19.68.020.

▮ Whether the decree erroneously impaired the defendant doctors' statutory right under RCW 18.34.010 to act as licensed dispensing opticians or to have opticians working directly under their personal supervision presents a correlative question. Inland Empire Optical was a licensed dispensing optician, but under all of the circumstances shown it could not, as the statute (RCW 18.34.010) requires, logically be said to be working under the supervision of the defendant doctors. The supervision, if any, was too remote, ill-defined and uncertain. In RCW 19.68.040, the legislature made it clear that physicians are authorized to charge their patients, or receive compensation, for professional services only if the professional services are actually rendered by the physician to his patient. In RCW 18.34.010, the legislature made it equally clear that, if a licensed optician is working under the personal supervision of the ophthalmologist, the work of the licensed optician in dispending glasses on the ophthalmologist's prescription in law amounts to no more than the lawful dispensing of eyeglasses by the doctor.[2]

The two sections of the statute must be reconciled so that, when read in pari materia, maximum possible effect will be given to both. RCW 19.68.040 requires the chapter (RCW 19.68) to be construed so that licensed medical practitioners charge and receive compensation only for professional services actually performed. RCW 18.34.010 authorizes, *inter alia,* a licensed optometrist to work for and under the personal supervision of a licensed physician and a licensed physician to have a licensed optometrist working for him under his personal supervision, and the proviso to

---

[2]RCW 18.34.010, *inter alia,* states:

"Nothing in this chapter shall:

"(1) Be construed to limit or restrict a duly licensed physician or optometrist or employees working under the personal supervision of a duly licensed physician or optometrist from the practices enumerated in this chapter, and each such licensed physician and optometrist shall have all the rights and privileges which may accrue under this chapter to dispensing opticians licensed hereunder;"

RCW 19.68.040 authorizes the ophthalmologist to collect compensation for professional services rendered by a licensed optician working under his direct and immediate personal supervision. Thus, it appears that the legislature intended, in situations similar to those before us, to allow licensed ophthalmologists to employ or associate with them in their offices a licensed optician under the immediate and direct supervision of the ophthalmologist.

One test of the validity of such a relationship under RCW 19.68 is whether a patient of ordinary understanding and reasonable prudence should reasonably understand that eyeglasses dispensed by the ophthalmologist's dispensing optician are in fact under not only the personal and immediate direction and supervision of the ophthalmologist, but at his responsibility as well. If the circumstances are such that the answer to this query is in the affirmative, then the ophthalmologist, we think, is within his statutory rights under RCW 19.68. If, however, the relationship between ophthalmologist and optician is so remote, indirect or distant that the latter is not under the immediate, personal supervision of the ophthalmologist, or their offices and laboratories are so physically separated that a patient of ordinary understanding would not readily assume that the optician is working for and under the physician's personal direction—and on the latter's responsibility—then the test of the statute is not met, for the optician's practice is so separate from that of the ophthalmologist that the ophthalmologist ought not benefit financially from the optician's practice from patients referred directly, indirectly or inferentially by the ophthalmologist to the optician.

The instant decree, however, we think exceeded the requirements of the case. Defendant doctors, we believe, have a right to own stock in a dispensing optical company provided they neither directly nor indirectly either verbally or in writing, or by sign, symbol or gesture, or by physical arrangement of their offices, refer their patients to the optical company, or indicate in any way their hopes that the patient take his prescription there. And the optical company has a right to own the equipment which it operates

and the materials it uses in making and dispensing eyeglasses.

Accordingly, the decree will be modified to allow the defendant doctors to retain ownership of their stock in Inland Empire Optical Company, and Inland Empire Optical Company its ownership of equipment and materials used by it in making and dispensing eyeglasses if, and on condition that, the doctors' offices, waiting rooms and laboratories are so physically separated from the offices of the optical company that patients have free and untrammelled access and exit to and from the doctors' offices without having to pass into or through the optical company's offices or closed premises; and on the further condition that the defendant ophthalmologists shall refrain from directly, indirectly or by inference, referring, directing, suggesting or inviting their patients to have their eyeglass prescriptions filled or eyeglasses repaired or altered by the Inland Empire Optical Company or any subsidiary firm controlled by it.

HUNTER, C. J., HILL, FINLEY, WEAVER, ROSELLINI, HAMILTON, and McGOVERN, JJ., concur.

NEILL, J. (concurring)—I concur in the result reached by the majority opinion, and in the modification of the trial court's decree. I disagree in some respects, however, with the test used to implement RCW 18.34.010. That statute provides in part:

Nothing in this chapter shall:

(1) Be construed to limit or restrict a duly licensed physician or optometrist or employees working under the personal supervision of a duly licensed physician or optometrist from the practices enumerated in this chapter, and each such licensed physician and optometrist shall have all the rights and privileges which may accrue under this chapter to dispensing opticians licensed hereunder; . . . .

The court's opinion implies that physical separation of the areas utilized by the doctors and the dispensing opticians is a primary and perhaps controlling factor to be

considered in determining whether opticians are working under the personal supervision of optometrists as contemplated by the statute. This physical relationship is repeatedly emphasized in the opinion. This emphasis upon the spatial relationship between the work areas of optometrists and opticians is misleading.

The crucial considerations in applying RCW 18.34.010 do not rest upon appearances, but upon the amount of direct supervision actually exercised. Inland Empire Optical is a separate corporation with its own operations manager who supervised its day-to-day activities. Under the current method of operation of Inland Empire Optical, I agree that the defendant physicians do not meet the requirements of the exception contained in RCW 18.34.010.

October 21, 1969. Petition for rehearing denied.